Connie GABALDON, Plaintiff,

v.

**Jo Anne B. BARNHART, Commissioner of Social Security, Defendant.**

No. CV 05–363 LCS.

United States District Court, D. New Mexico.

Oct. 26, 2005.

Michael S. Liebman, Santa Fe, NM, for Plaintiff.

Amy Mitchell, Cynthia L. Weisman, Albuquerque, NM, for Defendant.

### MEMORANDUM OPINION AND ORDER

SMITH, United States Magistrate Judge.

**THIS MATTER** came before the Court on Plaintiff's Motion to Reverse or Remand Administrative Agency Decision filed July 28, 2005. (Doc. 9.) The Commissioner of Social Security issued a final decision denying Plaintiff's application for Social Security Disability Insurance ("SSDI") and Supplemental Security Income ("SSI") on February 1, 2005. (R. at 7–11.) This matter comes before this Court pursuant to 28 U.S.C. § 636(c). The United States Magistrate Judge, having meticulously considered the Motion, briefs, administrative record, and applicable law, finds that this Motion is well-taken and should be **GRANTED** and this case is RE-MANDED to the Commissioner of Social Security for further proceedings consistent with this Memorandum Opinion and Order.

## I. STANDARD OF REVIEW

The standard of review in a Social Security appeal is whether the Commissioner's final decision is supported by substantial evidence and whether she applied the correct legal standards. *Hamilton v. Sec'y of Health & Human Servs.*, 961 F.2d 1495, 1497–98 (10th Cir.1992). "Substantial evidence requires more than a scintilla, but less than a preponderance, and is satisfied by such relevant evidence as a reasonable mind might accept to support the conclusion." *Gossett v. Bowen*, 862 F.2d 802, 804 (10th Cir.1988) (quotation marks and citations omitted). The decision of an Administrative Law Judge ("A.L.J.") is not supported by substantial evidence if the evidence supporting the decision is overwhelmed by other evidence on the record. *Id.* at 805 (citation omitted).

In order to qualify for disability insurance benefits or supplemental security income, "a claimant must establish a severe physical or mental impairment expected to result in death or to last for a

continuous period of [at least] twelve months which prevents the claimant from engaging in substantial gainful activity." *Thompson v. Sullivan*, 987 F.2d 1482, 1486 (10th Cir.1993) (citing 42 U.S.C. § 423(d)(1)(A)). The Secretary has established a five step process for evaluating a disability claim. *Bowen v. Yuckert*, 482 U.S. 137, 137, 107 S.Ct. 2287, 96 L.Ed.2d 119 (1987). At the first four levels of the sequential evaluation process, the claimant must show that he is not engaged in substantial gainful employment, he has an impairment or combination of impairments severe enough to limit his ability to do basic work activities, and his impairment meets or equals one of the presumptively disabling impairments listed in the regulations under 20 C.F.R. Part 404, Subpart P, App. 1, or he is unable to perform work he had done in the past. 20 C.F.R. §§ 404.1520 and 416.920. *See Reyes v. Bowen*, 845 F.2d 242, 243 (10th Cir.1988). At the fifth step of the evaluation, the burden of proof shifts to the Commissioner to show the claimant is able to perform other substantial gainful activity considering his residual functional capacity, age, education, and prior work experience. *See Gatson v. Bowen*, 838 F.2d 442, 448–449 (10th Cir.1988).

## II. PROCEDURAL HISTORY

Plaintiff, now fifty-three years old, submitted a claim for Social Security Disability Insurance benefits on December 13, 2001 and protectively filed an application for Supplemental Security Income payments on September 12, 2002. (R. at 22.) Plaintiff alleged her disability began on July 1, 2000 due to various physical and mental disorders including chronic pain, severe depression, and bipolar disorder. (R. at 89, 92.) Plaintiff has a high school education and has worked as a health care worker, a claims processor, a cook, and a waitress prior to the alleged onset of her disability. (R. at 93, 96.)

The Social Security Administration denied Plaintiff's claims both initially and at the reconsideration level. (R. at 51–54, 57–60.) Plaintiff retained Representative Michael Liebman (R. at 38) and appealed the denial of her application on February 21, 2003 by filing a Request for Hearing by Administrative Law Judge. (R. at 61–62.) On March 18, 2003, A.L.J. Kathleen H. Switzer issued a fully favorable decision, noting that a hearing would be unnecessary with the documentary evidence available. (R. at 45.)

A.L.J. Switzer analyzed Plaintiff's claim in accordance with the sequential analysis set forth in 20 C.F.R. § 404.1520(a)-(f). (R. at 45–50.) At step one of the sequential evaluation, the A.L.J. found that Ms. Gabaldon had not engaged in substantial gainful activity since the alleged onset date of disability in 2000. (R. at 45.) At steps two and three, the A.L.J. found that Plaintiff's myofascial pain, major depression, and panic attacks were "severe" within the meaning of 20 C.F.R. §§ 404.1421 and 416.921. (*Id.*) The A.L.J. determined, however, that Plaintiff's overall condition had not met or equaled in severity any disorder described in the Listing of Impairments, Appendix I, Subpart P, 20 C.F.R. §§ 401.1501–1599. (R. at 46.) At steps four and five, the A.L.J. assessed Plaintiff's Residual Functional Capacity ("RFC") and determined that Ms. Gabaldon had "a substantial loss of ability to meet the demands of basic work related activities on a sustained basis," that she would not be able to perform her past relevant work nor would the issue of transferability of skills be material, and that there were not a significant number of jobs

in the national economy Plaintiff would be able to perform. (R. at 46–49.) Accordingly, the A.L.J. concluded that a finding of disability was supported by Social Security Rulings 96–8 and 96–9p. (R. at 48.) Further, the A.L.J. noted that Plaintiff's allegations were both credible and consistent with the medical evidence of record. (R. at 48–49.)

Shortly after A.L.J. Switzer's decision, the Director of the Division of Disability Quality Operations ("DDQO") referred Ms. Gabaldon's case to the Appeals Council for own-motion review. (R. at 65–69.) In the report, the DDQO reviewers noted that there was no evidence of ongoing treatment for Plaintiff's claimed physical impairments for approximately two of the years since the alleged onset of her disability. (R. at 66.) They also concluded that the medical opinions on Plaintiff's impairments provided by Drs. Kravitz, Gzaskow, and Borrell were not supported by clinical findings, and primarily relied instead on the findings of Dr. Esparza. (R. at 66–67.) Further, due to the few objective findings that supported Plaintiff's subjective complaints of pain and Post Traumatic Stress Disorder ("PTSD"), and because of Ms. Gabaldon's own reports of her daily activities, the reviewers determined that her "allegations regarding the disabling effects of her impairments [were] not fully credible." (R. at 67.)

The DDQO reviewers, based on a review of the records and the A.L.J.'s decision, made the following conclusions: 1) Plaintiff had the RFC to perform medium unskilled work; 2) she is not disabled based on the framework of grid rule 203.22; 3) per Social Security Ruling ("SSR") 96–2p, the A.L.J. did not explain the weight given to a treating source opinion; 4) per SSR 96–7p, the A.L.J. did not explain why she found the Plaintiff credible; 5) per SSR 96–8p and SSR 96–9p, the A.L.J. "did not describe function-by-function the maximum amount of each work-related" activity Plaintiff could perform, nor did the A.L.J. provide "limitations based on an RFC for less than sedentary work"; and 6) per 96–5p, the A.L.J. "ignored a [treating source opinion] on an issue reserved to the Commissioner." [1] (R. at 67–68.)

The Appeals Council notified Ms. Gabaldon that it intended to review A.L.J. Switzer's opinion on its own motion. (R. at 70–73.) Plaintiff submitted written arguments supporting A.L.J. Switzer's decision and thirteen additional pages of medical records to the Appeals Council for their consideration. [2] (R. at 74–76.) Nevertheless, the Appeals Council decided to remand the matter to an A.L.J. on the basis that the evidence of record did not support a finding of disability. (R. at 77–81.) The Appeals Council found that Ms. Gabaldon had the capacity for a limited range of medium work, that she did not have the "multiple areas of moderate mental limitations found by the" A.L.J., and that her complaints were not fully credible. (R. at 79–80.) Accordingly, the Appeals Council remanded for further proceedings including the opportunity for a hearing, updated medical information from treating and examining physicians, a consultative mental status examination,

---

1. It is unclear from the report exactly how the A.L.J. ignored a treating source opinion, or what issue it related to that was reserved to the Commissioner.

2. Counsel for Ms. Gabaldon also made sure the Appeals Council had access to other medical records he had submitted previously. (R. at 74.) Plaintiff did not request an appearance before the Appeals Council to present oral argument. (See R. at 72, 74–76.)

and a medical expert to clarify the severity of Plaintiff's impairments, if necessary. (R. at 79–80.) Further, the Appeals Council noted that the A.L.J. could choose to consult a vocational expert ("VE") to identify appropriate jobs and to clarify what Plaintiff's limitations would have on her occupational base, if necessary; but before relying on the expert, the A.L.J. was to "identify and resolve any conflicts between the occupational evidence provided by the vocational expert and information in the Dictionary of Occupational Titles and ... the Selected Characteristics of Occupations ...." (R. at 80–81.)

A.L.J. Larry E. Johnson held a hearing on April 5, 2004; Plaintiff testified, and VE Duane Johnson was present but did not testify. (R. at 509–31.) The A.L.J. issued his decision on June 24, 2004, analyzing Plaintiff's claim in accordance with the sequential analysis set forth in 20 C.F.R. § 404.1520(a)-(f). (R. at 19–32.) At step one of the sequential evaluation, the A.L.J. found that Plaintiff had not engaged in substantial gainful activity since the alleged onset date of disability. (R. at 23.) At steps two and three, the A.L.J. found that Plaintiff's musculoskeletal impairments, fibromyalgia, arthritis, depression, and anxiety were "severe" within the meaning of 20 C.F.R. §§ 404.1421 and 416.921. (R. at 23–27.) The A.L.J. determined, however, that Plaintiff's overall condition had not met or equaled in severity any disorder described in the Listing of Impairments, Appendix I, Subpart P, 20 C.F.R. §§ 401.1501–1599. (R. at 27.) The A.L.J. further concluded that Plaintiff's allegations regarding her limitations were not fully credible because her complaints were inconsistent with the objective medical evidence. (R. at 29.) At step four, the A.L.J. determined that Plaintiff had an RFC for employment essentially within a full range of light work and that Plaintiff would be unable to perform her past relevant work. (R. at 29–30.) At step five, using the Medical–Vocational Guidelines ("the Grids") as a framework, the A.L.J. found that there were jobs existing in significant numbers in the national economy and that a finding of "not disabled" was directed by Medical–Vocational Rule 202.20, 20 C.F.R. Pt. 220, App. 2. (R. at 30.) The A.L.J. concluded that Ms. Gabaldon was not disabled at any time through the date of his decision. (Id.)

Plaintiff filed a Request for Review of Hearing Decision by the Appeals Council on July 27, 2004. (R. at 12–18.) The Appeals Council denied this request for review on February 1, 2005, thereby making the decision of the A.L.J. the final decision of the Commissioner for purposes of judicial review. (R. at 7–11.) On March 31, 2005, Plaintiff filed this Complaint seeking judicial review of the Commissioner's final decision pursuant to 42 U.S.C. § 405(g). (Doc. 1.)

## III. RELEVANT MEDICAL HISTORY

Ms. Gabaldon's physical problems date back to 1995 when she presented to Dr. John Sloan with chronic pain in her neck and arm due to repetitive original injury. (R. at 398–402.) Dr. Sloan noted that Plaintiff showed no signs of symptom magnification during a J-mar grip test at St. Joseph Hand Clinic, and he diagnosed Plaintiff with chronic upper extremity pain with evidence of a right cubital tunnel syndrome with slight delay in sensory and nerve latency. (R. at 400–01.) He placed restrictions on the amount of weight Plaintiff should lift and the time she should spend engaging in any repetitive motion. (R. at 400.) In November, 1995, Dr. Sloan

assessed a seven percent upper extremity impairment due to right cubital tunnel syndrome, and in January, 1996, he assessed an eight percent whole body impairment due to bilateral ulnar neuritis. (R. at 398–99.)

In October of 1999, Ms. Gabaldon saw her primary care physician, Dr. Gloria Ruiz, for neck pain after a fall in Plaintiff's bathroom. (R. at 453.) After another fall in January, 2000, Plaintiff began physical therapy at NovaCare due to muscle spasms in her lumbar area and pain in her knees, hips, and left upper extremity. (R. at 369.) X-rays taken at St. Vincent Hospital on the day of the fall were negative. (R. at 382.) The range of motion in Plaintiff's upper and lower extremities, cervical spine, hip, and left arm were within the normal range (R. at 364, 369); her physical therapist noted that the persistent pain was consistent with myofascial[3] dysfunction and SI joint dysfunction with posterior right pelvic rotation; myofascial tightness being the most probable primary cause of pain. (R. at 365.) The therapist also noted, however, that Ms. Gabaldon's complaints of pain were not consistent with her movement patterns and range of motion, and that Plaintiff tended to magnify her symptoms. (R. at 365, 368.) During the months after the fall, Plaintiff also saw Dr. Ruiz, complaining of pain in her left shoulder, at the elbow, neck, lower back, and both legs, in her left hand and arm, in her right hand, and she mentioned that both hands were starting to go numb and that she sometimes buckles at the hip. (R. at 451–52.) Dr. Ruiz noted that most of Plaintiff's pain was myofascial, that she

may have some tendonitis at the left shoulder, and that she probably has sacroiliitis.[4] (R. at 452.) Dr. Ruiz recommended cessation of house cleaning work, continued physical therapy, massage therapy, and medication. (*Id.*)

In March, 2000, Dr. Ruiz ordered full shoulder x-rays; they were negative for acute fracture or dislocation, negative for calcific tendinitis or other significant radiographic abnormalities, but did show mild degenerative changes at the AC joint. (R. at 449, 458.) Dr. Louis Seade also examined Plaintiff in March, assessing her with myofascial neck pain syndrome, impingement syndrome with rotator cuff tendonosis, and sacroiliac dyskinesis. (R. at 359–60.) Plaintiff described her pain as slight and refused the subacromial injections Dr. Seade recommended. (*Id.*) Plaintiff began seeing Dr. Carlos Esparza in April, 2000 for pain in her left hand, arm, and shoulder that she attributed to her January, 2000 fall. (R. at 159.) Dr. Esparza found no gross abnormalities or atrophy in Plaintiff's upper extremities or shoulders and found full range of motion in the cervical spine, shoulder, elbow, wrists, and digits. (R. at 160.) He did see some restriction in the left shoulder, noticed spasms in the left arm and shoulders, and noted that Plaintiff did not exhibit exaggerated pain behaviors. (*Id.*) Dr. Esparza assessed Plaintiff with left upper extremity strain/sprain, including the forearm, proximal arm, and shoulder girdle muscles, along with a mild right shoulder sprain. (*Id.*) He recommended exercise, physical therapy, and medication. (*Id.*)

Ms. Gabaldon successfully completed her physical therapy at NovaCare in May,

---

**3.** Myofascial means "[o]f or relating to the fascia surrounding and separating muscle tissue." STEDMAN'S MEDICAL DICTIONARY 1168 (Marjory Spraycar ed., Williams & Wilkins 26th ed.1995).

**4.** Sacroiliitis is "[i]nflammation of the sacroiliac joint." *Id.* at 1565.

2000, meeting all goals and making maximum medical improvement. (R. at 361.) Her goals included decreased lower back and shoulder pain, improved posture and body mechanics, and an increased ability to sit and stand pain free. (*Id.*) She received deep therapeutic massage from June, 2000 through February, 2001 at Life Transition Therapy. (R. at 373–78.) At the end of her treatment, the massage therapist noted that the therapy seemed to help Ms. Gabaldon's muscle pain in her shoulders, arms, and neck, but it had become clear through treatment that Plaintiff also suffered from undiagnosed nerve pain in her legs and arms which therapy did not relieve. (R. at 373.)

Plaintiff continued to see Dr. Esparza throughout 2000 and 2001 for a total of six documented visits. (R. at 151–61.) She told him that while the deep tissue massage did make her feel better (R. at 156–58), she believed such improvement was temporary. (R. at 155.) C-spine x-rays ordered by Dr. Esparza in July, 2000 showed some degenerative changes of the disc space at C5–6 with some slight spondylolisthesis of C5 on C6. (R. at 155.) A follow-up MRI of her cervical spine showed protrusions at C4–5 and more moderate protrusions at C5–6. (R. at 153.) Dr. Esparza noted that these protrusions were possibly the cause of Plaintiff's radicular symptoms and discussed surgery and epidural injections as treatment options. (*Id.*) In August, 2000, he recommended that she do no overhead reaching and that she limit lifting to fifty pounds occasionally and twenty-five pounds frequently. (*Id.*) Dr. Ruiz, who also examined Plaintiff in August, ordered lumbar and cervical MRIs and advised Plaintiff to take four weeks off of her house cleaning job, which seemed to be exacerbating her condition. (R. at 441–44.) The MRIs were performed in November, 2000; the lumbar spine MRI was unremarkable, the cervical spine MRI showed minimal degenerative disc disease with tiny disc protrusions, but was otherwise unremarkable. (R. at 379–81.) In a follow-up visit in December, 2000, Dr. Ruiz assessed Plaintiff with myofascial pain resulting from January's fall and recommended further massage and physical therapy and possibly a chiropractor and injections for her left shoulder. (R. at 437–38.)

In September, 2002, Plaintiff complained of neck, arm, lower back, and hip pain. (R. at 421–23.) Dr. Ruiz examined Plaintiff and found a range of motion in her neck about eighty percent of normal laterally, but nothing else remarkable; Dr. Ruiz did not recommend any medication in addition to the Ibuprofen Plaintiff had already been taking for pain, and noted that Plaintiff could see Dr. Esparza for some of her symptoms. (R. at 421–23.) Ms. Gabaldon fell in November, 2002, and presented to Dr. Ruiz with knee, back, arm, and neck pain. (R. at 418–19.) Dr. Ruiz assessed muscular tenderness in the paracervical and lumbar muscles, full range of motion of both knees without much pain, soft tissue injury to her knees, and exacerbation of her back pain; she ordered physical therapy and advised Plaintiff to take Ibuprofen for pain. (R. at 418.) Plaintiff attended therapy at Turquoise Trail Physical Therapy and Rehabilitation from December, 2002 to January, 2003. (R. at 238–46, 370–71.) She presented with myofascial pain syndrome consistent with right anterior ileal rotation and right upslip, and within four weeks reported that the therapy made her feel much better. (R. at 370.)

Dr. Thomas Kravitz performed a consultative examination of Plaintiff in December, 2002 upon request by the New Mexico

Disability Determination Services. (R. at 215–29.) Plaintiff presented with multiple complaints regarding chronic pain and psychiatric issues. (R. at 215.) His examination revealed tenderness in Plaintiff's neck over her fourth through seventh cervical vertebrae with some paraspinous spasm; no significant pathological adenopathy; mild tenderness in her lower lumbosacral spine without significant spasm appreciated; a full range of motion, though painful throughout much of her joints; and no active arthritis appreciated. (R. at 216–17.) In the Medical Source Statement of Ability to Do Work–Related Activities, Dr. Kravitz noted that Plaintiff should be limited to lifting ten pounds occasionally and less than ten pounds frequently because of cervical degenerative disc disease; Plaintiff could stand or walk up to two hours in an eight hour day because of chronic low back pain and cervical degenerative disc disease; and she could sit up to six hours in an eight hour day. (R. at 219–20.) He did not note limitations in Plaintiff's ability to reach overhead or handle or manipulate objects. (R. at 220.)

A DDS physician, who never examined Ms. Gabaldon personally, completed a Physical RFC sometime after Dr. Kravitz's exam. (R. at 223–29.) This evaluator concluded that Plaintiff could: occasionally lift and/or carry fifty pounds; frequently lift and/or carry twenty-five pounds; stand and/or walk about six hours in an eight hour workday; sit about six hours in an eight hour workday; and push and/or pull an unlimited amount. (R. at 224.) These conclusions were based on a review of Ms. Gabaldon's history; the evaluator noted

that Plaintiff had full range of motion in all joints despite complaints of multiple arthralgias, there were no signs of lumbar radiculopathy and minimal evidence of musculoskeletal restriction, and that Plaintiff's subjective complaints of pain were out of proportion to objective findings. (R. at 224–28.)

Ms. Gabaldon was seen in the emergency room in February, 2003 for shoulder pain. (R. at 247–51.) The next month, Dr. Ruiz referred Plaintiff to Dr. Murray Sokoloff, who primarily assessed fibromyalgia syndrome, post-traumatic,[5] and prescribed Propoxyphene and Ultracet. (R. at 257.) Plaintiff saw Dr. Sokoloff through September, 2003. (R. at 384–89.) Dr. Sokoloff found full range of motion in Plaintiff's wrists, elbows, shoulders, neck, hips, knees, ankles, and back. (R. at 387.) Over the months he prescribed physical therapy, Darvocet, Doxepin, Propoxyphene Hydrochloride, and joint injections for possible adhesive capsulitis. (R. at 384–89.) Plaintiff attended physical therapy at New Mexico Sports Fitness and Physical Therapy from May to August, 2003. (R. at 334–57.) Plaintiff consistently complained of fatigue and soreness, but therapists noted she was gradually improving. (*Id.*)

Ms. Gabaldon has also consistently been treated for psychological issues. In fact, Dr. Ruiz once opined that Plaintiff's greatest problem was her emotional psychiatric issues. (R. at 423.) Depression, anxiety, stress at home, counseling, and Zoloft are mentioned as early as 1999 in a progress note from Dr. Ruiz's office. In May and June, 2001, Plaintiff was admitted to St.

---

**5.** Fibromyalgia syndrome is defined as "a rheumatic disorder characterized by body aches, pain, stiffness, sleep disturbances and fatigue, as well as tenderness in specific sites on the body, that occurs predominately in women[.]" John Hopkins Medicine, http://www .hopkinshospital.org/health_info/Arthritis/reading/glossary.html (last visited Oct. 13, 2005).

Vincent Hospital two times for suicidal thoughts and depression. (R. at 163–67.) At discharge from her second admission, Dr. Daniel Collins assessed Plaintiff with major depression, alcohol dependence, and a Global Assessment of Functioning ("GAF") of 60,[6] up from an earlier GAF of 35;[7] he also recommended that she continue on Prozac, enter a Chemical Dependency program, and attend 12 step meetings. (R. at 164, 166.) Two months later, Plaintiff was admitted to St. Vincent's Intensive Outpatient Program where she made minimal progress. (R. at 168–69.) Plaintiff also received counseling as a victim of domestic violence from the Esperanza Shelter for Battered Families, Inc. from April through November, 2001. (R. at 171.)

Plaintiff's therapy continued at Santa Fe Community Guidance Center where she participated in individual and group therapy from August, 2001 to May, 2003, primarily with Dr. Gary Borrell and Mr. Peter Vance, M.S., LPC. (R. at 258–331.) On September 19, 2002, Dr. Borrell stated that Plaintiff was disabled from performing any occupation, and estimated it would be over twelve months before Plaintiff could return to work. (R. at 196.) In October, 2003, Mr. Vance completed a Medical Opinion Re: Ability to Do Work–Related Activities form. (R. at 392–93.) He concluded that due to recurring PTSD and depression, Plaintiff would be limited but satisfactory in thirteen of her work-related activities; seriously limited, but not precluded in seven areas of activities; unable to meet competitive standards in two areas; and unlimited or very good in four areas. (*Id.*) The most recent review of Plaintiff shows an assessment of major depressive disorder and PTSD; Mr. Vance stated that while Plaintiff has improved over time, she is still affected by the symptoms of her diagnoses. (R. at 258, 488.)

Dr. Michael Gzaskow completed a comprehensive psychiatric consultation for DDS in May, 2002. (R. at 173–77.) Dr. Gzaskow noted a depressed mood during discussion of Plaintiff's chronic pain and family, no evidence of any organic or psychotic thought pathology, and average intellectual functioning. (R. at 176.) He assessed her with major depression (chronic/severe), alcohol dependence in full remission, general anxiety disorder with episodic panic attacks, and borderline personality traits (by history). (R. at 176–77.) Dr. Gzaskow concluded that Plaintiff has an ability to relate to others that may be compromised by her depressive isolation and withdrawal, can follow and understand directions, attend to simple tasks, and manage her own funds. (R. at 177.) He noted that Plaintiff stated she could not withstand the stress and pressures associated with daily work activities. (*Id.*)

Dr. J. LeRoy Gabaldon completed a Psychiatric Review Technique and a Men-

---

**6.** The GAF Scale represents "the clinician's judgment of the individual's overall level of ... psychological, social, and occupational functioning." AM PSYCHIATRIC ASS'N, DIAGNOSTIC & STATISTICAL MANUAL OF MENTAL DISORDERS 32 (4th ed. Text Revision 2000) [hereinafter DSM–IV–TR]. A GAF between 51 and 60 represents "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupation, or school functioning (e.g.,

few friends, conflicts with peers or co-workers)." *Id.* at 34.

**7.** A GAF between 31 and 40 represents "[s]ome impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) OR major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (e.g., depressed man avoids friends, neglects family, and is unable to work ....)" *Id.*

tal RFC in June, 2002. (R. at 178–95.) He assessed mild restrictions of activities of daily living and difficulties in maintaining concentration, persistence, and pace, and mild to moderate difficulties in maintaining social functioning. (R. at 192.) He also concluded Plaintiff would be moderately limited in her abilities to accept and carry out detailed instructions, respond appropriately to criticism from supervisors and get along with coworkers or peers, be aware of and respond appropriately to change, and set realistic goals. (R. at 178–79.) Dr. Gabaldon felt that all other abilities would not be significantly limited. (*Id.*) He noted that Plaintiff's assertion of impairment did not appear to be consistent with available clinical evidence. (R. at 180.)

Dr. Jill Blacharsh completed a second Psychiatric Review Technique and Mental RFC in November, 2002. (R. at 197–214.) While she did find more limitations than Dr. Gabaldon had months earlier, Dr. Blacharsh concluded that Plaintiff could perform simple, repetitive, one to two step tasks with adequate pace and persistence. (R. at 197–99.) She also noted that Plaintiff was partially credible and consistent with the medical evidence of record. (R. at 199.)

## IV. DISCUSSION

In her Memorandum in Support of Plaintiff's Motion to Reverse or Remand, Plaintiff raises a number of issues in arguing that the A.L.J.'s decision was erroneous. (Doc. 12.) Plaintiff contends that: 1) the A.L.J. erroneously failed to consider evidence after Plaintiff's date last insured ("DLI"); 2) the Mental RFC Finding was unsupported by substantial evidence; 3) the finding that Ms. Gabaldon could perform light work was unsupported by substantial evidence; 4) the A.L.J. erroneously applied the Grids at step five; and 5) the credibility determination was unsupported by substantial evidence. (Doc. 10 at 16–26.)

### A. The A.L.J. Erroneously Failed to Consider Evidence Post–Dating Plaintiff's DLI.

██ ██ I agree that the A.L.J. erred by failing to properly consider evidence post-dating Plaintiff's DLI of December 31, 2002. (R. at 23, 25–28.) While a Title II claimant seeking disability insurance benefits must prove disability prior to her DLI, there is no such requirement for Title XVI claimants seeking SSI.[8] *See* Soc. Sec. Ruling 83–20, 1983 WL 31249, at *1. SSR 83–20 explains that SSI payments may only be awarded beginning with the first month the claimant is found disabled *after* her application is filed. *Id.* Normally, if a person is disabled at the time she filed under Title XVI, it is unnecessary to determine the onset date of her disability because she cannot receive SSI benefits pre-dating her application. *Id.* If, however, she filed an application under Title XVI *before* she is found to be disabled under the Social Security Regulations, it is necessary to determine her onset date in order to calculate when she was eligible for SSI payments. *Id.* This is exactly Ms. Gabaldon's predicament.

The Commissioner argues that although the A.L.J. misstated the time period under

---

**8.** Title II benefits require the claimant to have a work history; if there are enough quarters of credited work, the claimant is "insured" for purposes of Title II and can receive disability insurance benefits. Barbara Samuels, *Basic Social Security Retirement and Basic SSI Eligibility Requirements (Excluding Disability)*, 143 PLI/NY 41, 43 (2004). SSI eligibility is not based on work history, but on financial need. *Id.*

consideration, he ultimately adjudicated the correct period—from the alleged disability date through the date of his decision. (*See* Doc. 11 at 3; R. at 23, 26, 31.) Defendant argues that this "arguable deficiency in opinion writing technique does not require the court to set aside a finding that is supported by substantial evidence." (Doc. 11 at 3.) The Commissioner fails to discuss, however, the portion of the A.L.J.'s decision that is most troubling to the Court: in noting Dr. Sokoloff's April 7, 2003 diagnosis of Plaintiff with fibromyalgia, the A.L.J. writes: "It is not clear from a review of the record that the claimant developed fibromyalgia before her date last insured, December, 2002. Nonetheless, Dr. Sokoloff's diagnosis and treatment fell after the claimant's date last insured." (R. at 26.) It seems clear to me that the A.L.J. did not differentiate between Title II and Title XVI in the above conclusion. Even though the A.L.J. later determined that Ms. Gabaldon was not disabled through the date of the decision, such a conclusion appears to be unsupported by substantial evidence because of the cursory analysis of any medical evidence post-dating Plaintiff's DLI. (*See* R. at 25–31.) Because the decision does not consider the implications a later disability onset date would have on possible SSI payments, further findings should be made on whether Ms. Gabaldon was disabled after her DLI.

## B. The A.L.J. Conclusions Are Not Supported by Substantial Evidence.

The A.L.J.'s conclusions that Ms. Gabaldon's depression and anxiety were not severe and that her myofascial pain was not established by objective medical evidence are not supported by substantial evidence in the record. (R. at 28–29.) I note initially that Plaintiff asserts the A.L.J. erred in not following the directives contained in the Appeals Council's June 26, 2003 remand order. (Doc. 10 at 19; R. at 80.) Specifically, the A.L.J. did not comply with the Appeals Council's directive to obtain a second mental health consultative examination. (R. at 80.) Although Plaintiff appears to be correct in asserting that the A.L.J. did not follow this directive, this Court's jurisdiction extends only to the final decision of the Commissioner, "which in this case is the ALJ's second decision." *Gallegos v. Apfel,* 1998 WL 166064, at \*1 (D.N.M. Apr. 10, 1998) (citing 42 U.S.C. § 405(g); *Browning v. Sullivan,* 958 F.2d 817, 822 (8th Cir.1992)). As such, I do not have jurisdiction to consider Plaintiff's contentions regarding the A.L.J.'s adherence to the Appeals Council's remand order.[9] *Id.*

In assessing Plaintiff's mental impairments, the A.L.J. stated that Plaintiff's complaints of depression were inconsistent and not credible because they were not supported by objective medical evidence (R. at 29), largely situational and exacerbated by alcohol abuse and inconsistent compliance with medication (R. at 24, 26–27), and not severe enough, according to examiners, to cause marked limitations in work settings. (R. at 25–26.) The A.L.J. discounts or ignores, without adequate explanation, many portions of medical opin-

---

9. There is disagreement on the issue of whether a district court has jurisdiction to remand because the A.L.J. did not comply with the Appeals Council's directives. For example, the court in *Lok v. Barnhart* recently granted a claimant's motion to remand because the A.L.J.'s decision was not consistent with an earlier remand order of the Appeals Council. 2005 WL 2323229, at \*6 (E.D.Pa. Sept. 19, 2005). Like *Gallegos,* however, I find that "the ALJ's adherence to the Appeals Council's remand order is not cognizable by this court." 1998 WL 166064, at \*1.

ions which might support Ms. Gabaldon's claims. According to 20 C.F.R. § 404.1527, the A.L.J. is to consider several factors in deciding how much weight to give every medical opinion: whether the source examined the claimant; whether the source has a treating relationship with the claimant; the evidence supporting the opinion; how consistent the opinion is with the record; whether the source is a specialist; and any other relevant factors. 20 C.F.R. § 404.1527(a)(2)(d).

A.L.J. Johnson fails to articulate what weight, if any, he assigned to the various source opinions, or why he chose not to mention other source opinions, in whole or in part. For example, the A.L.J. cites an opinion submitted by Plaintiff's therapist, Mr. Vance, on Plaintiff's ability to do work-related activities. (R. at 26–27.) Mr. Vance's opinion is noted for the areas he believed Plaintiff would have "limited but satisfactory" functioning in, but there is no mention of the seven areas Plaintiff would have "serious limitations" in or the two areas in which she would be "unable to meet competitive standards." (R. at 26–27, 392–93.) And while the A.L.J. remarks that Mr. Vance submitted this opinion after Plaintiff's DLI, there is no explanation of why the decision does not cite to a single medical record from Mr. Vance or Gary Borrell, M.D., both of whom treated Plaintiff for Major Depressive Disorder (recurrent) and PTSD at the Santa Fe Community Guidance Center from August, 2001 through May, 2003. (R. at 258–331.) *See Huston v. Bowen*, 838 F.2d 1125, 1131 (10th Cir.1988) ("An ALJ may not ignore the evidence and make no findings.") (quoted in *Victory v. Barnhart*, 121 Fed. Appx. 819, 825 (10th Cir. Feb.4, 2005) (citations omitted) (holding that it was clear legal error for the A.L.J. to make absolutely no mention of a treating physician's opinion)).

This history of psychiatric care, coupled with at least nine visits to Plaintiff's primary care physician for emotional issues from August, 2000 through September, 2003, cause me to question the A.L.J's reasoning behind calling Plaintiff's complaints of depression inconsistent or not supported by objective medical evidence. (R. at 420–42.) Although I agree that there may be a problem concerning Ms. Gabaldon's irregular compliance with her medication, I question the A.L.J.'s reliance on Plaintiff's alleged alcohol abuse in deciding that her depression and anxiety failed to reach the severity considered by the Listings; according to at least two physicians, her alcohol abuse was in full remission and immaterial before her DLI. (R. at 27, 176, 199.) On remand, I echo the directive of the Appeal's Council to seek another mental health consultative examination as well as further findings based on the record to determine if Plaintiff's mental impairments are severe enough to be considered nonexertional impairments under the Grids.

■ Similarly, I find the A.L.J. erred in concluding that Plaintiff's myofascial pain was not established by objective medical evidence. (R. at 29.) He found that "[i]t is not clear from a review of the record that the claimant developed fibromyalgia before her date last insured, December 2002." (R. at 26.) "An ALJ has the duty to develop the record by obtaining pertinent, available medical records which come to his attention during the course of the hearing." *Carter v. Chater*, 73 F.3d 1019, 1022 (10th Cir.1996) (citing 20 C.F.R. § 404.944; *Baker v. Bowen*, 886 F.2d 289, 291–92 (10th Cir.1989)). Dr. Murray Sokoloff's records should have been more thoroughly examined; the fact that the medical records concerning Dr. Sokoloff's

diagnosis post-dated Plaintiff's DLI does not bar them from consideration. *See Hardman v. Barnhart*, 362 F.3d 676, 677–81 (10th Cir.2004) (remanding in part because an MRI, taken more than a year after the claimant's DLI, was not considered but was "crucial to an evaluation of whether objective medical evidence supports claimant's allegations of pain and limitation"). Fibromyalgia, the disease Dr. Sokoloff diagnosed Plaintiff with, is a rheumatic disorder. *See supra* n. 7. Unfortunately, A.L.J. Johnson misunderstood Dr. Sokoloff to be a dermatologist, when he is in fact a rheumatologist. (*See* R. at 26–27 ("the claimant was not diagnosed with fibromyalgia by a specialist in that area, but by a dermatologist"); Doc. 10 at 21 n. 8.) This fundamental error appeared to influence the A.L.J. in giving Dr. Sokoloff's opinion less credibility than it may otherwise deserve. 20 C.F.R. § 404.1527(d)(5) states, "[w]e generally give more weight to the opinion of a specialist about medical issues related to his or her area of specialty than to the opinion of a source who is not a specialist."

Further, I disagree that Plaintiff's complaints of pain were inconsistent. The medical record shows a long history of pain complaints and physical therapy (R. at 151–61, 238–47, 256–57, 332–57, 361–71, 373–78, 384–89, 400–01, 403–06, 412–18, 425, 437–53), as well as medications for pain such as Skelaxin, Propoxyphene, Ultracet, Depo–Medrol injections, Lortab, Ibuprofen, and Darvocet. (R. at 156, 257, 386, 412, 418, 440.) The main mention of any of these medications was in reference to Plaintiff's "noncompliance" with her OxyContin prescription; however, the A.L.J. failed to appreciate that Dr. Sokoloff's prescription for OxyContin said "p.r.n."—a phrase which means "use when or as needed." *See* Medical Abbreviations, http://pharmsci.buffalo.edu/courses/phc311/latin.html (last visited Oct. 21, 2005); R. at 28, 384.

█ The foregoing mistakes and omissions establish that the A.L.J.'s conclusions are not supported by substantial evidence in the record. (R. at 28–29.) On remand, the A.L.J. should make further findings regarding whether Plaintiff's fibromyalgia and mental impairments are severe within the meaning of the Listings and whether these nonexertional impairments significantly reduce the underlying job base, precluding conclusive application of the Grids. *See Allen v. Barnhart*, 357 F.3d 1140, 1143 (10th Cir.2004). I recommend obtaining additional medical testimony as to both Plaintiff's mental and physical impairments and VE testimony on the types of jobs Plaintiff can perform, if any. *See Trimiar v. Sullivan*, 966 F.2d 1326, 1333 (10th Cir.1992).

## V. CONCLUSION

In accordance with the standard of limited review, this Court has determined that this case must be remanded to the Commissioner for further proceedings, in accordance with this Memorandum Opinion and Order.

WHEREFORE, IT IS HEREBY ORDERED that Plaintiff's Motion to Reverse and Remand Administrative Agency Decision (Doc. 9) is ***GRANTED*** and this case is REMANDED to the Commissioner for further proceedings consistent with this Memorandum Opinion and Order. A final order will be entered concurrently with this Memorandum Opinion and Order.

**IT IS SO ORDERED.**